# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MASSACHUSETTS
# EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>DAVID GEORGE AKILLIAN,<br><br>Debtor | Chapter 7<br>Case No. 09-17200 (JNF) |
| JOSEPH BRAUNSTEIN, CHAPTER 7 TRUSTEE OF THE ESTATE OF DAVID GEORGE AKILLIAN,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL HAIG AKILLIAN,<br><br>Defendant | Adversary Proceeding No. 09-01388 (JNF) |

## SUPPLEMENTAL AFFIDAVIT OF COUNSEL AUTHENTICATING DOCUMENTS

I, Steffani Jill Boudreau, Esquire, hereby depose and state as follows:

1. I am an attorney in good standing duly licensed to practice law in the Courts of the Commonwealth of Massachusetts and in the United States District Court for the District of Massachusetts and am counsel to the Plaintiff, Joseph Braunstein, the Chapter 7 Trustee of the Bankruptcy Estate of David George Akillian, in the above captioned matter.

2. Attached hereto as **Exhibit 1** are true and accurate copies of portions of the Deposition Transcript of David Akillian cited to in the Plaintiff's Reply Brief and the Plaintiff's Motion to Strike.

Signed under the penalties of perjury this ___ day of October, 2010.

/s/ *Steffani Jill Boudreau*
Steffani Jill Boudreau, BBO No. 564967
Riemer & Braunstein LLP
Three Center Plaza
Boston, Massachusetts 02108
(617) 523-9000
sboudreau@riemerlaw.com

1250327.1

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>DAVID GEORGE AKILLIAN,<br><br>Debtor | Chapter 7<br>Case No. 09-17200 (JNF) |
| JOSEPH BRAUNSTEIN, CHAPTER 7 TRUSTEE OF THE ESTATE OF DAVID GEORGE AKILLIAN,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL HAIG AKILLIAN,<br><br>Defendant | Adversary Proceeding No. 09-01388 (JNF) |

## CERTIFICATE OF SERVICE

I, Steffani Jill Boudreau, of the law firm of Riemer & Braunstein LLP, hereby certify that on this __4__ day of October, 2010, I caused to be served a true and accurate copy of the *Supplemental Affidavit of Counsel* by causing a copy of same to be delivered electronically to:

Gary W. Cruickshank, Esquire
Law Office of Gary W. Cruickshank
21 Custom House Street, Suite 920
Boston, Massachusetts 02110

/s/ *Steffani Jill Boudreau*
Steffani Jill Boudreau, BBO No. 564967
Riemer & Braunstein LLP
Three Center Plaza
Boston, Massachusetts 02108
(617) 523-9000
sboudreau@riemerlaw.com

1

```
                    VOLUME:    I
                    PAGES:     1-56
                    EXHIBITS:  See Index
```

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

```
-------------------------------
In re:                         X  Chapter 7
    DAVID GEORGE AKILLIAN,     X  Case No.
        Debtor.                X  09-17200(JNF)
-------------------------------X
JOSEPH BRAUNSTEIN,             X
CHAPTER 7 TRUSTEE IN           X
BANKRUPTCY FOR THE ESTATE      X
OF DAVID GEORGE AKILLIAN,      X
    Plaintiff,                 X  Adversary
                               X  Proceeding
        vs.                    X  No. 09-01388
                               X
MICHAEL HAIG AKILLIAN,         X
    Defendant.                 X
                               X
-------------------------------
```

**DEPOSITION of MICHAEL HAIG AKILLIAN**

```
        AT:      RIEMER & BRAUNSTEIN LLP
                 Three Center Plaza
                 Boston, MA 02108

        DATE:    Tuesday, June 8, 2010

        TIME:    11:05 a.m.
```

Ivy L. Natanson, RPR

---

**REPORTERS, INC.**
**CAPTURING THE OFFICIAL RECORD**
617.786.7783/FACSIMILE 617.639.0396
www.reportersinc.com

Case 09-01388   Doc 41   Filed 10/04/10   Entered 10/04/10 15:00:39   Desc Main
Document      Page 5 of 17

15

| | | |
|---|---|---|
| 1 | A. | With my brother and then my mother. |
| 2 | Q. | What precipitated the phone conversation? |
| 3 | A. | I think I was just catching up, you know, so weekly phone call with my mother and my brother was there and he just raised it in conversation, that there was a mortgage on the house, and I was surprised by it and I spoke to my mother in the same phone conversation. |
| 10 | Q. | What did she tell you? |
| 11 | A. | That David had said he had a lot of financial need and that he wanted to take some of the assets out of the house, his share of the house, and use it sooner because he needed it sooner and she acquiesced twice. |
| | | And then we also agreed that when the time came to sell the house, that he would have already withdrawn that amount of money so whatever it was would come from his share of the sale of the house. |
| 22 | Q. | That was you and David agreed to that? |
| 23 | A. | And my mother, all three of us. |
| 24 | Q. | How did that -- when you say all three of |

16

1  you agreed, did you sit down in person?  Was
2  this on the phone during that one
3  conversation?
4  A.  It was in that conversation.
5  Q.  And you spoke to David and then you spoke to
6  your mother?
7  A.  Yeah.
8  Q.  And they agreed to that?
9  A.  Yeah.
10 Q.  And then you said you spoke to David and
11 then you spoke to your mother.  And then did
12 you speak to David again?
13 A.  I can't recall.  I think so.
14 Q.  Can you just tell me exactly what the
15 agreement was that was reached?
16     (Phone ringing.)
17 A.  That basically he was asking my mother to
18 withdraw -- to get his hands on assets that
19 were actually future assets.  He said, I
20 want to take some of the money that's going
21 to be my share of the house and use it now
22 because I need it now, and I think it was
23 with some reluctance that she agreed to do
24 that.  And then what we --

```
                                                          17
1    Q.    Why do you think it was with some
2          reluctance?
3    A.    One, because it wasn't something that she
4          came right out with at the time of either of
5          the mortgages.
6    Q.    How do you know that?
7    A.    Because she didn't say anything to me at
8          either of the times they took out the
9          mortgages.
10   Q.    So how does that evidence her reluctance?
11   A.    Well, I think the way it came up was sort of
12         tangential to a conversation we were having
13         because we were talking about the house and
14         David had said something about a mortgage.
15         I said, Well, there's no mortgage on that
16         house, that was paid off.  They paid off the
17         mortgage years ago.
18   Q.    So what you're saying is she probably
19         wouldn't have told you if it hadn't come up?
20   A.    I think it came up because they thought it
21         was time that I knew since we were talking
22         about something about the house, but it
23         wasn't like, Mike, how do you feel about
24         this, if we do it, at the time of either of
```

```
                                                              18
 1      the mortgages.
 2                 So they kind of shared it in the
 3      phone conversation and it was in that phone
 4      conversation that we said, okay, he's taking
 5      his portion of this house early.  It's going
 6      to come from his share, you know, when and
 7      if we sell the house, and they both said
 8      absolutely.
 9   Q. Do you know -- did anybody ever tell you --
10      strike that.  Did your mother or David ever
11      tell you what -- how much he was given?
12   A. They told me what the two mortgages were.  I
13      think one was 80 something and then the
14      other was 140 or 142 something, in that
15      order.
16   Q. Did they tell you how much David had
17      received?
18   A. All of it.
19   Q. And do you remember when this phone call
20      happened?
21   A. (Witness nodding.)
22   Q. The second mortgage was 2004 just to refresh
23      your recollection.
24   A. It was clearly after that but I don't
```

```
 1          remember the exact date.  If I had to guess,
 2          it was at least a year after the second
 3          mortgage.  It was probably a couple years
 4          before my mother died so somewhere in that
 5          range, maybe a year after the second
 6          mortgage and a couple years before she died.
 7     Q.   So you testified that he was given all of
 8          the money.  That was your understanding?
 9     A.   Yes.
10     Q.   And what was that understanding from?
11     A.   He told me.  And I think what he said was
12          that the second mortgage paid off -- he
13          rolled over part of the money from the
14          second mortgage to pay off the first
15          mortgage and then the balance he used for
16          bills and debt.
17     Q.   What specifically did he use the money for
18          from both the first and the second?
19     A.   I have no idea.
20     Q.   You have no idea.  Did you ask him?
21     A.   You know, just over time he said he had lots
22          of credit card debt and debt, you know,
23          child support, things of that sort, but he
24          never gave me an accounting of what it was
```

```
                                                          20
 1              for.
 2    Q.    Is it possible that he used any of the money
 3          to care for your mother?
 4    A.    I don't think so.
 5    Q.    You don't know?
 6    A.    My sense is not, but I don't know for sure.
 7    Q.    What was your mother's health condition in
 8          2004?
 9    A.    She was elderly but in pretty decent shape.
10    Q.    Did she have anyone care for her in her
11          home?
12    A.    No.  She was pretty independent.
13    Q.    And when you discovered that there were
14          these mortgages and the proceeds were paid
15          supposedly to David, you had a conversation
16          with David and your mother; that one
17          conversation?
18    A.    I didn't discover that they were supposedly
19          paid to him.  I was told that he received
20          the proceeds.
21    Q.    Okay.  Other than the conversation you spoke
22          about already, did you talk to anybody else
23          about the mortgages in your conversation?
24    A.    Just I think -- I think at one point my
```

21

```
 1              mother said to me, you know, I feel badly
 2              for your brother.  You know, he has lots of
 3              debt and whatnot, and I felt I needed to do
 4              this, so...
 5       Q.     This agreement that you're referring to, was
 6              it ever documented?
 7       A.     No.
 8       Q.     Did you ever put anything in writing to
 9              memorialize what your mother said or your
10              brother said or you said?
11       A.     No.
12       Q.     Did you share -- did you tell anybody else
13              about it?
14       A.     My wife.
15       Q.     And when would you have told your wife about
16              it?
17       A.     Probably five minutes after the phone call
18              ended.
19       Q.     Were you upset?
20       A.     I think so, yeah.  A little surprised.
21       Q.     Why?
22       A.     For two reasons.  One is that he was in that
23              kind of financial situation where he felt
24              obliged to ask for this and, second, that
```

22

1 they agreed to do it without sitting down
2 with me ahead of time and saying, Hey, this
3 is what we want to do.
4 Q. Did you express your dissatisfaction with
5 your mother or your brother, discuss it?
6 A. I probably did. Probably more with my
7 brother.
8 Q. Do you remember -- can you tell me about
9 that conversation?
10 A. Just more a case of I wish that he had
11 managed his finances differently so he
12 weren't in that situation and didn't have to
13 prevail upon my mother to do it because she
14 was the kind of woman who would acquiesce to
15 something like that.
16 Q. Well, aren't most mothers?
17 A. Sure. I remember -- I remember, and I don't
18 think it was in that phone conversation, her
19 expressing her discomfort because the house
20 was the only equity or asset that she had.
21 And so being a depression era person, having
22 some solid asset behind you and being fairly
23 frugal herself, I think it was troubling to
24 her, and I shared that with my brother.

1      brother and mother were at the property?
2   A. Uh-huh.
3   Q. And you were where?
4   A. At my house.
5   Q. There's a handwritten note on this document
6      from Watertown Savings Bank. It says,
7      "Deposit to David's account," and there's a
8      number circled or two numbers. Do you know
9      whose handwriting that is?
10  A. No.
11  Q. Is that your handwriting?
12  A. No.
13  Q. Have you ever seen this page of this
14     document before?
15  A. No.
16  Q. Do you know whether in May of 2004 $70,000
17     was deposited into David's account?
18  A. No.
19  Q. Do you have any idea of how the mortgage
20     proceeds from either mortgage were given to
21     David?
22  A. No.
23  Q. Do you have any knowledge concerning the
24     closings of either of the mortgages, who was

40

1   present at the closings?
2   A.   No.
3   Q.   Do you know who signed the promissory notes
4        for the mortgages?
5   A.   I think my mother signed them.
6   Q.   Have you seen copies of the promissory
7        notes?
8   A.   Not that I recall.
9   Q.   Do you know who would have those notes?
10  A.   I don't.  I would guess my brother.
11  Q.   Ordinarily a note would be returned once it
12       was paid.  So in 2008 when the loan was paid
13       off, the note should have been returned.
14       Was it returned to you?
15  A.   Then it might be in the stack of materials
16       that we received when we sold the house, but
17       I don't know for sure.
18  Q.   Have you looked for a copy of the note?
19  A.   No.
20            MS. BOUDREAU:  I'm going to make a
21       supplemental request.  I think that was
22       covered in the document request.  So if the
23       note --
24            MR. CRUICKSHANK:  Do you have a

1   closing binder at home from the sale of the
2   house?
3              THE WITNESS:  I do.
4              MR. CRUICKSHANK:  Will you check
5   and if you have anything --
6              THE WITNESS:  Just to be clear,
7   this is the note, Watertown Savings Bank,
8   saying that the outstanding mortgage against
9   the house was paid off to the bank?
10             MS. BOUDREAU:  No.  It's --
11  actually, there were two mortgages, one from
12  2001, one from 2004, and with each mortgage
13  there would have been a promissory note that
14  was secured by the mortgage.  So the copies
15  of the notes, the $83,000 note --
16             THE WITNESS:  So those are the
17  loans you're looking for?
18             MS. BOUDREAU:  Right.
19             THE WITNESS:  I don't think that
20  is in the package but I'm certainly willing
21  to look.
22  Q.   And did you ever have conversations with
23       David or your mother about the closings, how
24       they took place?

```
                                                              42
 1    A.    No.
 2    Q.    Who was present?
 3    A.    (Witness nodding.)
 4    Q.    Who the checks were distributed to?
 5    A.    I barely understood that they occurred.
 6              MS. BOUDREAU:  All right.  I'm
 7    going to mark the Watertown Savings Bank
 8    four-page document with the fax cover sheet
 9    as the first page as Exhibit 5.
10
11              (Exhibit 5 received and marked
12              for identification.)
13
14    Q.    And you have no evidence that other than
15          what David told you that he actually
16          received the mortgage proceeds?
17    A.    And what my mother said.
18    Q.    You haven't seen any bank account statements
19          to reflect that he got the money?
20    A.    No.
21    Q.    And you were aware that your mother, as the
22          trustee of the Ceil & Red Realty Trust, was
23          the only person who signed the mortgages?
24    A.    Yes.
```

52

1   A.    I think it was with GMAC.

2   Q.    Did you ever receive any -- I guess it would
3        be a 1099 from Watertown Savings Bank with
4        respect to this property?

5   A.    No.

6         MS. BOUDREAU: Okay. I'm going to
7   mark the 2008 tax return of Michael and
8   Carol Akillian as Exhibit 11.

9

10         (Exhibit 11 received and
11         marked for identification.)

12

13   Q.    Now, would it be fair to say that if you
14        were -- if David was going to essentially
15        pay you back from the money that he had
16        taken out of the property, that you would be
17        his creditor?

18         MR. CRUICKSHANK: Objection.
19   Legal conclusion. You can answer if you
20   want, Michael, but you're not qualified to
21   answer that.

22   A.    I have no answer.

23         MS. BOUDREAU: Okay. I have
24   nothing further.