## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS - BOSTON

==============================

IN THE MATTER OF:          .   Case #09-17200
                           .

DAVID GEORGE AKILLIAN   .   **February 15, 2011**
              Debtor.   .   11:19:30 a.m. O'clock
==============================

JOSEPH BRAUNSTEIN      .   Adv. #09-1388
    CHAPTER 7 TRUSTEE    .
              Plaintiff,  .
         v.             .
MICHAEL HAIG AKILLIAN   .
           Defendant.  .
==============================

### TRANSCRIPT OF HEARING ON:
### (#25) PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT;
### (#26) MEMORANDUM OF LAW IN SUPPORT OF [#25];
### (#27) AFFIDAVIT OF STEFFANI JILL BOUDREAU, ESQ. AUTHENTICATING DOCUMENTS RE: [#29] MEMORANDUM;
### (#34) DEFENDANT'S OBJECTION THERETO;
### (#35) DEFENDANT'S MEMORANDUM IN SUPPORT OF [#34];
### (#36) AFFIDAVIT OF MICHAEL HAIG AKILLIAN;
### (#37) AFFIDAVIT OF DAVID GEORGE AKILLIAN;
### (#38) DEFENDANT'S CONCISE STATEMENT OF DISPUTED MATERIAL FACTS RELATIVE TO OPPOSITION;
### (#45) REPLY TO [#34];
### (#40) PLAINTIFF'S MOTION TO STRIKE PORTIONS OF DEBTOR'S AND DEFENDANT'S AFFIDAVITS;
### (#41) AFFIDAVIT OF STEFFANI JILL BOUDREAU, ESQ.;
### (#57) RESPONSE OF DEFENDANT TO PLAINTIFF'S MOTION TO STRIKE PORTION OF AFFIDAVITS OF DEBTOR AND DEFENDANT
### BEFORE THE HONORABLE JOAN N. FEENEY, J.U.S.B.C.

**APPEARANCES:**   (See next page)

Electronic Sound Recording Operator:   Kaida M. Patterson

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service

## GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299    FAX 1-609-927-9768    1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 2 Cover
#09-17200
AP#09-1388
2-15-2011

**APPEARANCES - Continued**

For Debtor, Michael Haig Akillian:          GARY W. CRUICKSHANK, ESQ.
                                            21 Custom House Street   Suite 920
                                            Boston, MA 02110

For Plaintiff, Trustee Joseph Braunstein:   STEFFANI JILL BOUDREAU, ESQ.
                                            Riemer & Braunstein, LLP
                                            Three Center Plaza
                                            Boston, MA 02108

Electronic Sound Recording Operator:   Kaida M. Patterson

Electronic Sound Recording Operator:   Kaida M. Patterson

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

1   (At 11:19:17 a.m.)

2          THE COURT:   Braunstein vs. Akillian.

3          MR. CRUICKSHANK:   Good morning, Your Honor.   Gary

4   Cruickshank for Michael Akillian, the defendant.

5          THE COURT:   Good morning.

6          MS. BOUDREAU:   Good morning, Your Honor.   Steffani

7   Boudreau for Joe Braunstein.

8          THE COURT:   All right, I'll start with the

9   plaintiff, please.   Do you know why the property was

10   transferred from the trust to the two brothers?

11          MS. BOUDREAU:   I think it was -- my understanding

12   is that it was for the purposes of Land Court so the brothers

13   could convey it, rather than from the trust, since the

14   trustees had deceased.

15          THE COURT:   Right.

16          MS. BOUDREAU:   So in order to create clear title,

17   the brothers went to Land Court, filed an action to get the

18   title in their name.

19          THE COURT:   So the trust wasn't terminated, was it?

20          MS. BOUDREAU:   The trust was terminated at -- the

21   trust provided that at the death of the last trustee the trust

22   would terminate, and the proceeds would be distributed.   But I

23   think the way it works is the proceeds are distributed, and

24   then the trust is terminated, so I --

25          THE COURT:   Well, isn't that an important question?

1        MS. BOUDREAU:  I don't think so, Your Honor, because

2    whether the distribution came through the debtor as a benefit,

3    or whether the transfer came through the debtor as a

4    beneficiary of the trust, or through the debtor directly.

5        THE COURT:   How was the property held?  Tenants in

6    common, or joint tenants?

7        MS. BOUDREAU:   Joint tenants.

8        THE COURT:   Joint tenants.  Mmhmm.  And was there

9    any written agreement between them other than the trust as to

10   how proceeds would be distributed?

11       MS. BOUDREAU:   There was no written agreement, Your

12   Honor.   No, there was not.   But what we believe happened,

13   and I think it's pretty clear from our papers, is the -- the

14   trust provides in Art -- in Paragraph 8 of the trust that the

15   mother, or the trustees could care -- could use the trust

16   property, the income from the trust property, you know, in

17   whatever manner they chose for the support --

18       THE COURT:   And she chose to refinance it, and it's

19   undisputed that she gave money to the debtor, correct?

20       MS. BOUDREAU:   That is correct, Your Honor.

21       THE COURT:   So --

22       MS. BOUDREAU:   The issue -- how much is --

23       THE COURT:   -- why did there have to be a true-up

24   at the end?

25       MS. BOUDREAU:   I'm sorry?

1          THE COURT:   Why did there have to be a true-up at

2   the end?  Why did the debtor get less than Michael?

3          MS. BOUDREAU:   He shouldn't have.  The debtor

4   should *not* have gotten less than Michael, and that's our

5   position.  The defendant's argument, Michael's argument is

6   that there was this agreement between the deceased mother, the

7   debtor, and Michael, that when the trust was -- when the

8   property was ultimately sold, Michael would get more because

9   the debtor had got paid during --

10         THE COURT:   He'd get a cred -- he'd -- the debtor

11  would get a deduction for what he had already gotten.

12         MS. BOUDREAU:   That's right.  But -- but there's no

13  proof of that agreement.

14         THE COURT:   What paragraph of the trust says that

15  the mother can do whatever she wants during her life with the

16  property?

17         MS. BOUDREAU:   Paragraph 8, Your Honor.  And it's

18  Exhibit A to the appendix.

19         THE COURT:   In connection with the 2001 and 2004

20  refinancing, did the checks go directly from the refinancing

21  lenders to the debtor, or did they go through the mother?

22         MS. BOUDREAU:   It's unclear, Your Honor, because

23  copies of the checks were not produced.  Copies of the notes

24  were not produced.  What we are informed is that the notes --

25  the mortgages themselves were just signed by the mother.  The

1 notes we believe were just signed by the mother.  The proceeds

2 from the mortgages we suspect went to the mother and then were

3 used, as she's permitted, with her discretion.  Some of the

4 proceeds the defendant was able to track, through showing a

5 bank account statement.  It looks like there was a $50,000

6 deposit in 2004 at or around the time there was -- or 2001, at

7 or around the time one of the mortgages were taken.  But

8 there's missing money that they say the mother never received,

9 but of course the mother's not here to testify.

10           THE COURT:   Was this a nominee realty trust?

11           MS. BOUDREAU:   Yes, Your Honor.

12           THE COURT:   So shouldn't Michael have been informed

13 and his consent have been given before the mortgage was

14 granted and the proceeds distributed to David?

15           MS. BOUDREAU:   Not under the terms of the trust,

16 Your Honor.   The terms of the trust give the trustee the

17 unfettered discretion to mortgage the property, to convey the

18 property, to do -- you know, it was a basic --

19           THE COURT:   To use --

20           MS. BOUDREAU:   -- nominee realty trust.

21           THE COURT:   -- to use --

22           MS. BOUDREAU:   To use --

23           THE COURT:   -- the property.

24           MS. BOUDREAU:   To use the property, and that's just

25 what she did; and now what occurred to me and the Trustee is

1    that after the fact the debtor was either pressured by the

2    defendant, or felt badly because he had gotten more of the

3    money and reached an agreement; but for the Court to --

4             THE COURT:   Well, was there an agreement between

5    them at the closing of the sale?

6             MS. BOUDREAU:   There was never a written agreement.

7    There was no -- as, that I've seen; and there's no allegations

8    there was a written -- there was nothing.  What I'm told

9    happened at the sale, they directed the closing attorney who

10   -- if -- I don't want to speak out of turn, but I believe was

11   a relative, David Barber.   And you can correct me if I'm

12   wrong.  Yeah.

13            THE COURT:   Mmhmm.

14            MS. BOUDREAU:   They directed Attorney Barber to

15   transfer, to give David X and Michael Y, and --

16            THE COURT:   Are there any writings in connection

17   with that distribution?

18            MS. BOUDREAU:   Other than the copies of the checks,

19   there are not.  And the HUD.

20            THE COURT:  The settlement statement reflected 330--

21            MS. BOUDREAU:   Yes.

22            THE COURT:   Total.

23            MS. BOUDREAU:   Yes.  The 330 -- and so --

24            THE COURT:   Are there any memorandum in the file --

25   the attorney's file?

1          MS. BOUDREAU:   We -- I believe we asked for

2    documents relating to any agreements; and again, David Barber

3    was a relative.

4          THE COURT:   You didn't get anything.

5          MS. BOUDREAU:   We got nothing.   There was nothing.

6    We were told there -- you know, there was no writing.   There

7    is no documents evidencing this alleged agreement.

8          THE COURT:   All right.   I didn't mean to interrupt

9    you, but I wanted to ask my questions --

10          MS. BOUDREAU:   No, no --

11          THE COURT:   -- while I had them fresh in my mind.

12          MS. BOUDREAU:   That's fine, Your Honor.   The --

13    what we -- there's two matters before the Court:   There's the

14    plaintiff's motion to strike the affidavit, the  -- certain

15    allegations of the affidavit.   The -- several of the

16    allegations of both the debtor and the defendant fall outside

17    of the Rule 56 parameters, Your Honor.

18          The defendant's counsel in his response suggests

19    generally that the Court allow all of the statements to lie

20    and give the Court the discretion to weigh their weight, but

21    we believe that under evidentiary rules they're not permitted.

22          So, Your Honor, turning to the affidavit of the

23    defendant, Paragraph 4, he claims, he states:

24          "I've never been a creditor of my brother."

25    Your Honor, we -- the Trustee believes this is a legal

1   conclusion; and, in fact, during the deposition of the

2   defendant --

3          THE COURT:   Well, he might not think he has a

4   claim, but he might have a claim.  Is that what you're saying?

5          MS. BOUDREAU:   Well, we believe he *is* a creditor.

6          THE COURT:    Mmhmm.

7          MS. BOUDREAU:   And we believe his statement that he

8   is --

9          THE COURT:   And what's his right to payment from

10  the debtor if they had an oral agreement that this was the

11  distribution that they --

12         MS. BOUDREAU:   Well, his argu --

13         THE COURT:   -- stipulated to?

14         MS. BOUDREAU:   His argument is that the debtor

15  received money during the mother's lifetime.

16         THE COURT:   That's not undisp -- that's not

17  disputed, is it?

18         MS. BOUDREAU:   No.   And that the debtor

19  essentially owed him that money at the time of the closing.

20  So it's either a fraudulent transfer, or --

21         THE COURT:   What if -- what if they -- suppose at

22  the closing that they agreed on the distribution, and that the

23  debtor agreed, "I got advances from Mom during her life, and I

24  agree with you that my distribution should be less."

25         MS. BOUDREAU:   I think --

1          THE COURT:   Is -- does that mean that -- a creditor

2     is defined as a claimant, and a claim is defined as a right to

3     payment.   What does -- and I don't know if there was such an

4     agreement.   There isn't any evidence what they agreed to at

5     the closing, but let's just suppose that there was that

6     discussion.   How would that affect his status as a creditor

7     if they agreed that -- on that distribution other than fifty-

8     fifty each?

9          MS. BOUDREAU:   Well, I think the fact that he

10    agreed that he was owed money, or that the debtor owed money

11    doesn't -- doesn't make him a creditor or not a creditor.   He

12    -- his claim is that the debtor got money during the debt --

13    the mother's lifetime, and that he was owed that money; and he

14    had a claim from that property or from the debtor --

15          THE COURT:   But what if -- what if they agreed that

16    this was an appropriate distribution?   How does that affect

17    his --

18          MS. BOUDREAU:   I don't think --

19          THE COURT:   -- claim as a creditor?

20          MS. BOUDREAU:   -- under the -- I'm not sure I

21    understand your question; but I don't think under the trust

22    claim --

23          THE COURT:   A claim is a right to payments.

24          MS. BOUDREAU:   Yes.

25          THE COURT:   In order to be a creditor you have to

1   hold a claim.

2          MS. BOUDREAU:   That's right.

3          THE COURT:   Those are the three definitions.

4          MS. BOUDREAU:   Okay.

5          THE COURT:   So if they agreed that the distribution

6   would be as it was made, what is the right to payment that

7   Michael had against David?

8          MS. BOUDREAU:   Well, I don't think he *did* have a

9   right to payment.  It's *his* argument that he had a right to

10  payment.  He's saying on the one hand, this -- this wasn't a

11  fraudulent transfer because he was entitled to the money.  And

12  we're saying, "Well, if it wasn't a fraudulent transfer then

13  you were, at the very least, a creditor because you're making

14  a claim that you were entitled to payment --"

15         THE COURT:   Has he filed --

16         MS. BOUDREAU:   "-- from the debtor."

17         THE COURT:    -- a proof of claim?

18         MS. BOUDREAU:   He has not, because he was paid.

19  He received the money that he was, quote/unquote "owed."  And

20  that's his argument, that he was owed this money, so he was a

21  creditor.  Under his own argument, under his own analysis of

22  the case he was a creditor.   And the Trustee -- you know,

23  it's not critical to the Trustee's position that he was or

24  wasn't a creditor because --

25         THE COURT:   Well, that was my next question.

1          MS. BOUDREAU:    -- we think that under -- from a

2   fraudulent transfer, we think our 540 --

3          THE COURT:    What difference does it make, and how

4   is it material?

5          MS. BOUDREAU:    Well, if he -- if he -- if the

6   Trustee is unable to establish the elements of fraudulent

7   transfer, then we think at the very least it was a preference,

8   so we have alternative claims in the complaint.

9          THE COURT:    And then his creditor status would be

10  material.

11         MS. BOUDREAU:    And that is why his creditor status

12  is relevant.  I'm sorry, Your Honor.  Yes.

13         So anyway, in Paragraph 4 of his affidavit, the

14  creditor says, "I've never been a creditor."  The defendant

15  says, "I've never been a creditor of my brother."  During the

16  deposition we asked, "Are you a creditor of the brother?"

17  Attorney Cruickshank said -- objected to our inquiry.  He

18  said, "That's a legal conclusion."  We said, "We agree that

19  that's a legal conclusion, and we think that that should be

20  stricken from the affidavit."

21         And do you want me to just continue, or do you want

22  to rule on them as I go, or -- ?

23         THE COURT:    Why don't I hear from Mr. Cruickshank

24  now on whether Paragraph 4 should be stricken.

25         MR. CRUICKSHANK:    At the deposition I did -- Gary

1  Cruickshank -- I'm sorry -- for Michael Akillian.

2         At the deposition I did object to Attorney

3  Boudreau's question relative to, "Are you a creditor?" because

4  I felt that was a legal conclusion.  It is still a legal

5  conclusion; however, my client's understanding of whether or

6  not he was owed money by his brother I believe is something

7  that he can articulate.  Whether or not this Court gives it

8  any weight is up to the Court.  I don't think it should be

9  stricken.

10        THE COURT:   How is it material to this summary

11 judgment motion, though?   I agree with you that it's material

12 to the preference Count; but the Trustee is only moving on the

13 fraudulent transfer Count right now.

14        MS. BOUDREAU:   Your Honor, we're actually moving --

15 there's a -- the summary judgments on both Counts I and Count

16 II, yes.

17        THE COURT:   You *are* moving on both.

18        MR. CRUICKSHANK:   And that's --

19        THE COURT:   I'm sorry.

20        MR. CRUICKSHANK:   -- that's how -- that's what I

21 thought, Your Honor, and therefore --

22        THE COURT:   My mistake.  Go ahead.

23        MR. CRUICKSHANK:   And therefore whether or not he

24 is or is not a creditor is germane to the issue of whether or

25 not there was a preferential transfer, so I would ask that it

1    not be stricken.    It is a legal conclusion; however it's --

2    you know, whether or not Mr. Michael Akillian was owed money

3    by his brother, Michael would know that, and he's entitled to

4    testify to that.

5         THE COURT:    What -- what discussions did they have

6    about the distribution of proceeds?

7         MR. CRUICKSHANK:    The two affidavits that are

8    submitted, both of Michael and David, indicate that the --

9    everybody understood that Mich -- excuse me, David, with the

10   assistance of his mother, by the real estate mortgages, got an

11   advance on the inheritance; and when it was time to divvy up

12   the sale proceeds that the mortgage that was on the property

13   created by David's -- with his mother's assistance borrowing

14   -- should be paid on to David's -- the debtor's portion; and

15   therefore that --

16        THE COURT:    You've got a Statute of Frauds problem

17   *and* a Statute of Wills problem.

18        MR. CRUICKSHANK:    Well, I would -- I'm -- on the

19   issue of summary judgment, Your Honor, I don't know how you

20   decide this case without hearing Mr. Akillian -- both Mr.

21   Akillians testify as to what was the understanding, what was

22   the -- the -- the understanding between the gentlemen.

23        David got an advance on his inheritance, not an

24   uncommon scenario; and when it came time to settle up that

25   inheritance David's advance was taken out to pay off the

1   Watertown Savings Bank.

2           THE COURT:   And they agreed on that.

3           MR. CRUICKSHANK:   They agreed on that, right.   Now

4   was it in writing?   I've not been able to find anything, and I

5   don't think it was; but I don't know that *vis-á-vis* the two

6   brothers would have to be in writing.

7           THE COURT:   So why isn't that defense barred under

8   the Statute of Frauds or Wills?

9           MR. CRUICKSHANK:   Well, I don't -- I don't think it

10  is a defense, or excuse me --

11          THE COURT:   Does it come within any --

12          MR. CRUICKSHANK:   -- any -- I don't think --

13          THE COURT:   -- exception?

14          MR. CRUICKSHANK:   -- it -- I don't think it -- is

15  -- requires any kind of a writing.   I mean, at the time this

16  whole transaction was -- was done, you know, David wasn't in

17  bankruptcy.   I doubt that he was contemplating it.   I've never

18  frankly asked him the question, but it was a simple payment of

19  the mortgage of the property that David had caused to be

20  placed on there, and I think that -- I don't know that -- I

21  don't think there has to be a written agreement.   I don't

22  think it's a Statute of Frauds issue.   It's very simply an

23  understanding between the brothers as to what was going to

24  happen with their inheritance on the real estate.

25          THE COURT:   But the trust -- the trust said,

1          "Distribution of proceeds shall be fifty-fifty."

2  Correct?

3          MR. CRUICKSHANK:   Well, it says "share and share

4  alike," right.

5          THE COURT:   What does *that* mean?

6          MR. CRUICKSHANK:   Well, I don't think it precludes

7  the reality of this situation: Namely, David having encumbered

8  part of the real estate with -- with mortgages for his

9  benefit.  Now in David's affidavit he indicates at both times,

10 the 2001 and the 2004 refinancing, the check was payable to

11 him.  And he will testify to that, and he has testified to

12 that in the document.

13         This "share and share-alike" language was put -- you

14 know, put into the trust when it was put together back well

15 before his borrowing; and I think, Your Honor, in order to

16 make a determination as to whether or not Michael gets some

17 kind of a windfall, this has got to be a trial.  I

18 respectfully suggest that it can't be resolved on summary

19 judgment, which is what we're here today on.  This is not a

20 question of who wins and loses.  It's a question of did

21 Michael -- does Michael get his day in court?

22         THE COURT:   Well, the status as creditor, just on

23 that issue alone --

24         MR. CRUICKSHANK:   Mmhmm.

25         THE COURT:   -- is relevant to reasonably equivalent

1  value that was exchanged at the time of the transfer for

2  fraudulent transfer purposes, because "value" is defined in

3  Section 548(c)(2) as,

4         "Property or satisfaction or securing of a present

5          or antecedent debt of the debtor."

6  So if they agreed that Michael was owed money by David, then

7  the distribution could have constituted reasonably equivalent

8  value, because he was --

9         MR. CRUICKSHANK:  Well, that's a -- that's a good

10 -- an interesting analysis, Your Honor.  At the time that

11 this was happening, Michael didn't think to himself, "David

12 owes me money."  Michael thought to himself, "The net

13 proceeds -- or the sale proceeds, I'm entitled to half of

14 them.  David's entitled to his half, and then he pays his

15 mortgage out of his half."  They weren't thinking is he a

16 creditor, not a creditor.

17        Maybe as a matter of law you're right.  Maybe he was

18 a creditor.  But, you know, this is an after-the-fact

19 analysis in the sense that at the time that this was all going

20 on, after Mom died and they put the house up for sale and the

21 property went into their name, Michael was going to get, you

22 know, his share of the proceeds, and David was going to get

23 his share and then pay off his mortgage.  That's what they

24 were thinking.

25        THE COURT:  Well, what is material about his

1   belief?  Either he was or he wasn't.  Isn't that for me to

2   decide?

3         MR. CRUICKSHANK:   Well, it *is* for you to decide,

4   Your Honor, but I don't think you can decide it on affidavits

5   and the Trustee's motion for summary judgment.  I think you

6   need a trial.  That's -- that's --

7         THE COURT:   Well, for the preference section, why

8   isn't that just a matter of law --

9         MR. CRUICKSHANK:   Well, I --

10         THE COURT:   -- and his belief immaterial?

11         MR. CRUICKSHANK:   You have to -- Michael didn't

12   believe he had an antecedent debt from David.  There was no

13   promissory note.  There was no agreement that, "David, you owe

14   me -- "

15         THE COURT:   But they were trueing up.  They were

16   accounting for the advance, so to the extent that David got

17   more than Michael before the sale, then David owed Michael, so

18   he *was* a creditor.

19         MR. CRUICKSHANK:   Well, I -- that's not -- that's

20   not the way they were thinking.  I think their thought

21   process--

22         THE COURT:   But their thought is immaterial.

23         MR. CRUICKSHANK:   Well, I don't -- I'm -- with all

24   due respect, Your Honor --

25         THE COURT:   Their belief --

1        MR. CRUICKSHANK:    -- I think their thought *is*

2   material, because in -- in both of their minds Michael's half

3   of the sale proceeds were Michael's.

4        THE COURT:    But the distribution speaks for itself,

5   doesn't it?

6        MR. CRUICKSHANK:    But, Your Honor, the

7   distribution--

8        THE COURT:    They decided that David should get less

9   because he had gotten more previously.

10       MR. CRUICKSHANK:    The distribution didn't come from

11  property of the estate.   This real estate was not property of

12  the bankruptcy estate.

13       THE COURT:    But David's interest wasn't ("was in"?)

14  his interest in property of -- of the debtor.

15       MR. CRUICKSHANK:    The real estate.

16       THE COURT:    Whatever his interest was.

17       MR. CRUICKSHANK:    Right, the real estate --

18       THE COURT:    You say it was limited because of his

19  prior advance; and the Trustee says it should have been half.

20  That's the legal issue.

21       MR. CRUICKSHANK:    That -- well, that's -- but I

22  think, Your Honor, you need to understand by evidentiary

23  hearing what the parties intended, what the understanding was,

24  to somehow determine if David ended up getting the short end

25  of the deal.

1          THE COURT:   Well, that's why I want to know what

2    their discussions were.

3          MR. CRUICKSHANK:   And I suggest, Your Honor, that

4    affidavits don't do that.  We need an evidentiary hearing, and

5    that's why I've opposed the summary judgment, not because I'm

6    guaranteed a slam-dunk win.  I didn't file a cross-motion for

7    summary judgment.  I think Michael is entitled to his day in

8    court so that you can understand that this was not some kind

9    of attempt to either prefer himself over David's creditors or

10   to obtain any kind of a fraudulent conveyance.  That's why an

11   evidentiary hearing is -- a trial is necessary.

12         THE COURT:   The question is is not whether it was

13   an actual fraudulent transfer but whether it was a

14   constructive fraudulent transfer --

15         MR. CRUICKSHANK:   But-- but he --

16         THE COURT:   -- whether he -- whether his creditors

17   got value for his interest or whether his interest should have

18   been something more.

19         MR. CRUICKSHANK:   Well, David's creditors *did* get

20   value for his interest because his -- the mortgage by

21   Watertown Savings Bank, it was incurred because of David

22   borrowing, they were paid.  I think there's enough factual

23   issues here, Your Honor, that if -- you know, it shouldn't be

24   more than --

25         THE COURT:   Well, on the --

1        MR. CRUICKSHANK:    -- a two- or three-hour trial.

2        THE COURT:    I'm still on the motion to strike.

3        MR. CRUICKSHANK:    I'm sorry, Your Honor.  Okay.

4        THE COURT:    The -- I decline -- deny the motion --

5  I decline to allow the motion to strike with respect to Count

6  IV, although I don't think it's material what Mr. Michael

7  Akillian thought about his status.  It is relevant whether or

8  not he is a creditor, whether he had a claim against his

9  brother, and any right to payment.   I can't tell that now

10 because I don't know what their discussions were.  The record

11 is devoid of what their agreement was on the closing date.

12       MS. BOUDREAU:    Okay, Your Honor, moving on to --

13       THE COURT:    The next --

14       MS. BOUDREAU:    -- para -- Paragraph -- the next one

15 I'm going to address is Paragraph 12, Your Honor, of Michael's

16 affidavit.

17       THE COURT:    The next one was #7, I thought.

18       MS. BOUDREAU:    Your Honor, the next one is #7, but

19 essentially the defendant's opposition convinced me that he

20 was just citing the language of the trust, and I have no issue

21 with #7.

22       THE COURT:    Okay.

23       MS. BOUDREAU:    #12, Your Honor, Michael Akillian

24 states,

25       "The mortgage was obtained at the request of my

1          brother, and the proceeds were paid to and utilized

2          by my brother."

3   First of all I'd like to just --

4          THE COURT:   You say that's hearsay.

5          MS. BOUDREAU:   I say that's hearsay.   During his

6   deposition he testified that he knew nothing, and it's

7   Paragraphs 39 and Paragraph -- I'm sorry, Pages 39 and 40 of

8   Michael's deposition he said he knew nothing of where the

9   proceeds went, knew nothing of the distribution of the

10  proceeds, and he has no personal knowledge of where that money

11  went.

12          I'd also just like to clarify --

13          THE COURT:   Well, isn't it undisputed that the

14  mother gave David the proceeds --

15          MS. BOUDREAU:    It is not --

16          THE COURT:   -- to pay off his own debt?

17          MS. BOUDREAU:   It is not undisputed, Your Honor.

18  There are --

19          THE COURT:   It's *not* undisputed?

20          MS. BOUDREAU:   It is not undisputed.   It is -- it

21  is irrelevant, but the amount that David received from the

22  mortgage proceeds has not been established.   The -- Attorney

23  Cruickshank stated in his argument just a minute ago that --

24  that the debtor's affidavit says that the debtor -- the

25  proceeds check were made payment to the debtor; the debtor's

1  affidavit doesn't say that, Your Honor.   The debtor's

2  affidavit *does* say, "I received the proceeds from the

3  mortgages," but there's no reference to the check.  We still

4  do not know who these checks were made payable to.  But again,

5  the --

6             THE COURT:   Who has the checks?

7             MR. CRUICKSHANK:   Well, Your Honor, if I could on

8  that issue, Paragraph 17 of David's affidavit states the

9  following:

10             "A check representing the net proceeds of the 2004

11             mortgage was payable to your affiant,"

12  -- which was David  --

13             " -- which I utilized for various purposes,"

14  -- and let me just see --

15             MS. BOUDREAU:   Oh, Your Honor, I was looking at

16  Paragraph 22.   So in any event, you're right --

17             THE COURT:   Just a minute.   David got the proceeds

18  of the mortgage, correct?   Isn't that undisputed?

19             MS. BOUDREAU:   That's what he says, Your Honor.

20  There is an issue, and we raise it in our motion, that there's

21  $30,000 from one of the mortgages that the defendant hasn't

22  been able to establish that David received.  We don't know

23  obviously, because the mother isn't with us, what the mother

24  -- whether the money received -- whether the mother received

25  any benefit from the money, whether she was -- whether she

1  received any of the money.  All we have --

2         THE COURT:  Okay, anything else on striking

3  Paragraph 12?

4         MS. BOUDREAU:  Just that it's hearsay, Your Honor,

5  and it contradicts the deposition testimony of Michael

6  Akillian.

7         THE COURT:  Mr. Cruickshank, anything else?

8         MR. CRUICKSHANK:  And this is Michael's affidavit;

9  and David has testified as to why the property was obtained.

10 This would be arguably hearsay.  I do think what my client

11 Michael thought is impor -- is germane; and once again, the

12 Court can, you know, give it whatever weight or not it decides

13 to do.

14        THE COURT:  So the extent that the paragraph states

15 that *David* requested the mortgage, that's hearsay, and it's

16 stricken.

17        MR. CRUICKSHANK:  Yes, Your Honor.

18        THE COURT:  The proceeds of the mortgage needs to

19 -- the issue of where the proceeds were paid is the subject of

20 documentation, and Michael doesn't have any knowledge of that.

21 So that's stricken.  Next.

22        MS. BOUDREAU:  The same issue, Your Honor, with

23 Paragraph 12.

24        THE COURT:  We just did Paragraph 12.

25        MS. BOUDREAU:  I'm sorry, Paragraph 13.  No

1  knowledge, no personal knowledge.  Again, he testified at his

2  deposition.

3            THE COURT:   That's allowed -- to be stricken.

4            MR. CRUICKSHANK:   I'm sorry.  This --

5            MS. BOUDREAU:   It's stricken.

6            THE COURT:   Paragraph 13 --

7            MR. CRUICKSHANK:   Oh, 13.  I --

8            THE COURT:   He doesn't have any knowledge of the--

9            MR. CRUICKSHANK:   That's fine.

10           THE COURT:   -- checks.

11           MR. CRUICKSHANK:   Understood.  Understood.

12           MS. BOUDREAU:   And Paragraph 14, the defendant

13 can't testify as to his brother's intent, which is what he

14 does in Paragraph 14.

15           THE COURT:   I agree.  All right, did you have

16 anything else on the motion for summary judgment?  We've

17 covered a lot of it in the context of discussing the motion to

18 strike, but I'll -- I can hear you for -- if you have anything

19 else.

20           MS. BOUDREAU:   Okay, well, I also have -- the

21 motion to strike also relates to David's affidavit which the

22 Court can take, you know, at its own.  We also look to strike

23 several paragraphs of --

24           THE COURT:   All right.  I brought it out with me.

25 Paragraph 5?

1          MS. BOUDREAU:   Paragraph 5, Your Honor.  Oh, and we

2   withdraw -- for the same reasons stated --

3          THE COURT:   Right.

4          MS. BOUDREAU:   -- with respect to Michael's, we

5   withdraw --

6          THE COURT:   Paragraph 12?

7          MS. BOUDREAU:   12 to -- 12 and 17, Your Honor.  We

8   suggest that the Best Evidence Rule would require the

9   production of the documents he's discussing.  No one has

10  produced the checks, as I've stated, representing the mortgage

11  proceeds, though they were requested.   The mortgages and the

12  notes were --

13         THE COURT:   Has anyone gone to the banks and asked

14  for the files on these refinancings?

15         MS. BOUDREAU:   We have not, Your Honor.  No.

16         THE COURT:   Mr. Cruickshank, do you wish to be

17  heard on the Paragraph -- the averments in Paragraph 12 and

18  17?

19         MR. CRUICKSHANK:   Yes.  David can certainly testify

20  as to what he received from the 2001 and 2004 refinancings;

21  and in terms of the bank records, they have not been sought by

22  myself, but --

23         THE COURT:   All right, I deny the motion to strike.

24  He can testify from his own personal knowledge that he got the

25  proceeds, and that's all he's saying here --

1          MR. CRUICKSHANK:   Thank you, Your Honor.

2          THE COURT:   --  although he hasn't submitted the

3    check, he -- he's qualified to say he got the check, it was

4    paid to him, it was delivered and cashed by him.   That's --

5          MS. BOUDREAU:   Okay.

6          THE COURT:   -- his testimony.

7          MS. BOUDREAU:   The Paragraphs 14 and 16, Your

8    Honor, of the debtor's affidavit we seek to strike because

9    it's the debtor's opinion of what Michael Akillian knew.

10          THE COURT:   Well, he's trying to testify as to

11    Michael's knowledge, and he can't do that.   I allow that to be

12    stricken.

13          MR. CRUICKSHANK:   Well --

14          MS. BOUDREAU:   And the same thing with Paragraph

15    16, Your Honor.

16          MR. CRUICKSHANK:   I was going to say, Your Honor,

17    Paragraph 16, it says,

18          "I did not *tell* my brother Michael about the

19          mortgage,"

20     -- so at least that part he can certainly testify to.

21          THE COURT:   I agree.

22          MS. BOUDREAU:   But the balance of that would be

23    stricken, Your Honor?

24          THE COURT:   Yes.   Paragraph 17, I deny the motion

25    to strike.

1          MS. BOUDREAU:   I don't have the motion to strike

2    Paragraph 17, Your Honor.

3          THE COURT:   Oh, you don't?

4          MS. BOUDREAU:   Paragraph 18.

5          THE COURT:   I'm sorry.

6          MS. BOUDREAU:   Paragraph 18 is the next, which is

7    again a legal conclusion.

8          MR. CRUICKSHANK:   Well, Your Honor, David can

9    certainly testify that,

10          "My brother has never borrowed any money from me,"

11   -- and whether or not the Court accepts that in this --

12          THE COURT:   Whether --

13          MR. CRUICKSHANK:   -- in determining his status as a

14   creditor.

15          THE COURT:   Whether he is a creditor is a question

16   of law.  What about Paragraph 23?

17          MS. BOUDREAU:   Lastly, Your Honor, Paragraphs 23

18   and 24 are hearsay.

19          THE COURT:   Aren't those hearsay, Mr. Cruickshank?

20          MR. CRUICKSHANK:   David is stating what he asked

21   his mother.  He's not saying what his mother said.

22          THE COURT:   That's an out-of-court statement.

23          MR. CRUICKSHANK:   He said --

24          THE COURT:   [reading]

25          "I talked to my mother.  I asked my mother to

1          refinance."

2    Isn't that an out-of-court statement?

3          MR. CRUICKSHANK:   Well, it's -- but it's his

4    statement.  Yes, it's out of court, but it's his statement.

5          THE COURT:   It doesn't matter.  That's hearsay.

6          MR. CRUICKSHANK:   Well, I -- I -- he was only

7    testifying as to what he requested.

8          THE COURT:   It's a declarant's testimony that he

9    asked his mother to refinance, and it's hearsay.  Unless you

10   can tell me what exception it comes through, it's hearsay.  An

11   out-of-court statement offered for the truth of the matter

12   asserted.

13         MR. CRUICKSHANK:   Understood.

14         THE COURT:   All right, anything else on the motion

15   for summary judgment?

16         MS. BOUDREAU:   That -- you know, on the motion for

17   summary judgment, Your Honor, we will rely on our memo of law.

18   I'd like to address one thing that Attorney Cruickshank said,

19   and then maybe go over a couple of salient facts, or salient

20   points, I should say.

21         We submitted a memorandum of law in support of

22   summary judgment.  We had eighteen, I think, concise

23   Statement of Facts.  Not one was in dispute.  The only

24   disputed issues that -- that the defendants have set forth as

25   issues of fact -- or the only issues of fact, I should say, is

1   the first, Michael Akillian did not receive any proceeds from

2   the mortgages granted on the real estate.   That is not -- and

3   this is in the Concise Statement of Disputed Material Facts

4   Relative to Opposition for Summary Judgment that was filed on

5   September 21st, or is dated September 21st -- or filed

6   September 21st on behalf of Michael Akillian.   Paragraph 1,

7   that is not in dispute, Your Honor.

8        The second issue is Michael Akillian is not a

9   creditor of the debtor.   That again is a legal conclusion.

10        And the third is Michael Akillian did not receive a

11   transfer of the property.   The debtor issued -- receives his

12   share of the sale proceeds.   That, we believe, is also a legal

13   issue, whether the debtor -- the defendant's legal position

14   here is that he didn't receive a transfer.   It's a little

15   confusing to me, but that's a legal confusing -- a legal

16   issue, Your Honor.

17        And this, together with the eighteen undisputed

18   statements in the memorandum of law, make this the perfect

19   case for summary judgment, Your Honor.

20        What the defendants are asking you to do -- or what

21   the defendant is asking you to do is use your equity

22   jurisdiction and give the defendant a break because the debtor

23   got more.   But the Court can't look beyond the terms of the

24   trust.   It can't -- the Court can't attack what the mother

25   did, in her own discretion, by supporting the son, the debtor,

1 and -- and basically say, "No, that's not what the mother

2 meant.  That's not what she was entitled to do," or, "That's

3 not what we're going to hold.  That's not what we're going to

4 say she did," and attack that discretion and insert its own in

5 its place.

6       THE COURT:  Well, isn't -- isn't the issue what the

7 extent of the interest of the debtor was at the time of the

8 distribution?  And if the parties had orally agreed that the

9 distribution should take into account his prior advance from

10 his mother, was his interest in property different from the

11 brothers at that time?

12       MS. BOUDREAU:  Your Honor, I'm going to --

13       THE COURT:  And is -- and let me just follow up,

14 please.  Does it make any difference that they took the

15 property out of the trust and put it into joint tenancy?

16       MS. BOUDREAU:  I think, well, two -- to answer your

17 question, the second question first:  The fact that they took

18 it out of the trust and put it into a joint tenancy, I think

19 that weakens the defendant's argument, Your Honor, because

20 then it was property owned by Michael and the debtor, with no

21 debt, if you will, or no -- no -- no remaining issues relating

22 to what the trust did or what the Trustee did, and Michael

23 just gave him more of the proceeds, point blank.

24       THE COURT:  But there was a right of survivorship

25 with the joint tenancy.  Is it significant that they didn't

1   put it in a tenancy in common?

2        MS. BOUDREAU:   Your Honor, now I'm thinking whether

3   -- let me just see how they did put the property.

4      (Long pause)

5        MS. BOUDREAU:   You know, it didn't say "joint

6   tenants," actually, in the Land Court order, Your Honor.  So I

7   do believe that they were -- they held the property as tenants

8   in common.   Because I think in order to -- and it doesn't say

9   on the deed; but in order to hold the property as joint

10  tenants, the deed has to actually say "as joint tenants with

11  the right of survivor," and it doesn't here.  The Certificate

12  of -- the title -- and Mr. Cruickshank can correct me if I'm

13  wrong, but I believe that the property was actually held by --

14  as -- by the two brothers as tenants in common.

15        THE COURT:   Do you have a copy of the deed, or the

16  Land Court order?

17        MR. CRUICKSHANK:   Well, Your Honor, what I --

18        THE COURT:   It's registered land, correct?

19        MS. BOUDREAU:   Yes.

20        MR. CRUICKSHANK:   I have a copy of the deed from

21  David and Michael to the purchasers, and what it says -- and I

22  apologize for my lack of real estate prowess, but it says, you

23  know, it grants a half -- no, I'm sorry.  This is granting it

24  to Mi -- to the buyers.

25        THE COURT:   So --

```
 1              MR. CRUICKSHANK:  Oh, wait --

 2              THE COURT:  Was there a deed in from the trust, or

 3   somebody to --

 4              MR. CRUICKSHANK:  Could I --

 5              THE COURT:  -- the debtor and --

 6              MR. CRUICKSHANK:  Could I --

 7              THE COURT:  -- Michael?

 8              MR. CRUICKSHANK:  This -- the deed to the buyers--

 9              THE COURT:  What are you looking at?  Because I can

10   look -- I have --

11              MR. CRUICKSHANK:  I'm not sure, Your Honor --

12              THE COURT:  -- everything on my computer.

13              MR. CRUICKSHANK:  -- if this is -- this is actually

14   an exhibit to any of the pleadings that are before you.  I'm

15   looking at a copy of the deed recorded August 1st of 2008 from

16   David, the debtor, and Michael, to Michael Travers and Kelly

17   Mann, husband and wife.

18              THE COURT:  Those are the buyers.

19              MR. CRUICKSHANK:  Right, and then the second page--

20              THE COURT:  Well, how -- did that deed describe how

21   they held it?  Or does it just say --

22              MR. CRUICKSHANK:  If I could --

23              THE COURT:  -- "David and Michael"?

24              MR. CRUICKSHANK:  I'll read it for the record, if I

25   could:
```

1           "For our title deed," --

2  -- excuse me --

3           "For our title, see deed from Cecelia Akillian and

4           George Akillian dated April 5th of '83, filed with

5           the Land Registration Office of the Middlesex County

6           Registry of Deeds, Document #637549, Certificate of

7           Title 167467 in Book 967, page 117; death

8           certificate of George Akillian filed with the deed

9           of said document; and death certificate of Cecelia

10          in support thereof, and filed herewith."

11  I don't see any --

12          THE COURT:   That doesn't answer it --

13          MR. CRUICKSHANK:   It doesn't answer it, Your Honor.

14          THE COURT:   -- I don't think.

15          MS. BOUDREAU:   Your Honor, if you'd look at Exhibit

16  B to the Affidavit of Counsel Authenticating Documents you'll

17  see the Land Court order.

18          THE COURT:   All right, just a minute.   What number

19  is that?

20          MS. BOUDREAU:   Exhibit B.

21          THE COURT:   No.   What number is the -- is that in

22  your statement of --

23          MS. BOUDREAU:   It's the Affidavit of Counsel

24  Authenticating Documents.   I don't know.   Oh, let me see what

25  number it is there.

1            THE COURT:   It's the supplemental affidavit or the

2  first one?

3            MS. BOUDREAU:   No, it's the original affidavit.

4            THE COURT:   The first one.

5            MS. BOUDREAU:   #27, Your Honor.

6            THE COURT:   Okay.  What Exhibit -- you have --

7            MS. BOUDREAU:   #2, Your Honor.  I have a copy

8  here.

9            THE COURT:   They're lettered A through M on mine.

10            MS. BOUDREAU:   I'm sorry.  Exhibit B, Your Honor.

11            THE COURT:   B.  All right, thank you.

12       (Pause)

13            THE COURT:   Did I ask you whether the trust was

14  terminated?

15            MS. BOUDREAU:   You did, Your Honor.  The language

16  of the trust in paragraph 10 --

17            THE COURT:   Terminates on the death of the last to

18  die of the co-trustees, so that would have been their mother,

19  Cecelia.

20            MS. BOUDREAU:   That's right.  "Upon termination--"

21            THE COURT:   [reading]

22            "And the assets of the trust are to be distributed

23            in equal shares, share and share alike."

24            MS. BOUDREAU:   That's right.

25            THE COURT:   For the beneficiaries.  So that

1    happened because they were deeded the property.

2              MS. BOUDREAU:   That's correct.

3              THE COURT:   And how was title held?

4              MS. BOUDREAU:   Title was held by Michael and David

5    as tenants in common, Your Honor.  And if you look at --

6              THE COURT:   And you say that's reflected in the

7    Land Court judgment?

8              MS. BOUDREAU:   Well, if you look at the Land Court

9    judgment, which again is Exhibit B, the last paragraph, it

10   says:

11              "After due proceedings it's ordered that Certificate

12              of Title # (blank) be canceled and a new certificate

13              be issued for the land described to David George

14              Akillian and Michael Haig Akillian."

15              THE COURT:   And since it doesn't say "short te"--

16              MS. BOUDREAU:   With rights of survivorship.

17              THE COURT:   -- "joint tenants with the rights of

18   survivorship," you say it's a tenant in common.

19              MS. BOUDREAU:   Yes.

20              THE COURT:   Okay.  I'm there now.  So what is the

21   effect of it being tenants in common?   Could they reach an

22   agreement as joint owners of the property, as tenants in

23   common, that the distribution could be different from -- than

24   fifty-fifty of the equity?

25              MS. BOUDREAU:   They could, if he hadn't filed

1  bankruptcy, Your Honor.  Because obviously the bankruptcy --

2          THE COURT:  Well, what is the effect of any

3  agreement they might have reached on what interests of the

4  debtor in property was transferred for the purposes of the

5  first clause of 548?

6          MS. BOUDREAU:  I don't think it changes anything,

7  Your Honor.  I think that whether they reached an agreement,

8  whatever their agreement might have been, it's irrelevant for

9  the purposes -- from a bankruptcy 548 analysis.

10         THE COURT:  Can tenants in common agree that on a

11 sale of property they can accept less than a fifty-fifty

12 share?

13         MS. BOUDREAU:  Absolutely, except when they file

14 bankruptcy 364 days later, and there's a Trustee appointed,

15 and the Trustee says, "Wait.  There was not an equal

16 distribution.  Fifty per cent of your interest should have

17 been part of the estate."

18         THE COURT:  So why does the terminated trust

19 govern?

20         MS. BOUDREAU:  The term -- well, it -- it's the

21 position that the term -- that the property was distributed

22 pursuant to the terms of the trust, and the trust governed

23 what happened during the mother's lifetime.  The trust governs

24 her -- her discretionary use of the property to support the

25 son, and the trust governs the -- how the property was to be

1   distributed.  And just because the brothers went to Land Court

2   and got a Certificate of Title doesn't mean that the trust --

3   where the trust specifically governs the distribution --

4        THE COURT:  Well, how do we know that?   Do we

5   know what their discussions were?

6        MS. BOUDREAU:  I don't  -- whose discussions?

7        THE COURT:  Do we know what their agreement was?

8   Michael and David's, as to what their respective interests

9   would be in the property once their mother died?

10        MS. BOUDREAU:  They didn't -- they were

11   beneficiaries, Your Honor; and with all due respect, they

12   didn't have the ability to make an agreement.   The Trustee,

13   when they formed -- they declared the trust --

14        THE COURT:  Well, the trust was implemented,

15   because they were given the property as tenants in common.

16   The trust was done with.  They were given the property as

17   tenants in common, and then they sold it.   Does it make a

18   difference of they decided that David should get less because

19   he had gotten more previously under the trust?

20        MS. BOUDREAU:  I think the same analysis applies.

21   I understand what you're saying.  I think the same analysis

22   applies.

23        THE COURT:  I'm asking.  I'm not saying anything.

24        MS. BOUDREAU:  No, no, no.  I think the same

25   analysis applies.  I don't think that they can reach an

1  agreement that's contrary to the rights of the debtor's

2  creditors.  If he hadn't filed bankruptcy, sure, they can

3  agree to whatever they like, and -- but -- but they *did* file

4  bankruptcy.  So whether the language of the *trust* prevails,

5  that they should share and share alike, or whether, just as a

6  matter of tenants in common they're fifty per cent -- each

7  have fifty per cent interest, I don't think they can agree --

8  agree that away once he's in bankruptcy.

9       THE COURT:  The question is whether they could

10  agree it -- agree to it *before* the bankruptcy.

11       MS. BOUDREAU:  They can agree to whatever they want

12  to agree, but the Trustee can look back and say --

13       THE COURT:  But this isn't a 544.  You're bringing

14  this under 548, and you can avoid an interest of the debtor in

15  property.  The question is, what interest of the debtor in

16  property was transferred?  And if they had agreed that his

17  interest would be less, is that binding for fraudulent

18  transfer purposes?  Or stated for the purposes of summary

19  judgment, is there a genuine issue of material fact as to what

20  the debtor's interest in the property was?

21       MS. BOUDREAU:  I don't think so, Your Honor.  I

22  think that the debtor's -- the defendant's attorney, Trustee's

23  attorney, and everybody agrees that the trust document is the

24  document that --

25       THE COURT:  Under Massachusetts law is the

1   ownership interest of a tenant in common always fifty per

2   cent?

3          MS. BOUDREAU:   Unless otherwise agreed.  And here I

4   think there's no dispute.  I mean, the property came from the

5   two as beneficiaries through this Land Court proceeding, for

6   the purposes of being able to sell the property, and they

7   owned it.  They owned it as -- as they had owned it as

8   beneficiaries.  Their ownership interest didn't change.  The

9   form of title changed so they could convey it.  And even in

10  the Land Court order, it says,

11              "Plaintiffs are the beneficiaries of the trust, as

12              set forth in Paragraph 8."

13         THE COURT:   Did you have anything else on your

14  motion?

15         MS. BOUDREAU:   I would just like to point out that

16  were -- the argument that the defendants are making would, as

17  I noted at the beginning, require the Court to look beyond

18  what the mother did and to disregard her wishes when she was

19  alive to take care of the son.   There is no -- the Statute of

20  Frauds and the trust itself requires any modification to be in

21  writing, any amendment to be in writing.

22         THE COURT:   I understand your argument.  The

23  follow-up question, however, is what was the effect of the

24  cessation of the trust, the termination as a matter of law on

25  her death, and the brothers got what they were entitled to

1   under the trust.   They got the property to be held by them as

2   tenants in common, and could they make an agreement changing,

3   after the termination of the trust, changing their respective

4   interests?   And if so, how should that have been reflected

5   legally?

6          MS. BOUDREAU:   Well, (a), I don't think they did

7   make that agreement.  I don't think that was ever their

8   understanding.  I don't think that was ever their intent.  I

9   don't think that's what the Land Court order reflects.   The

10  Land Court order says, "Plaintiffs are the beneficiaries," and

11  they did it -- I believe that he testified -- Mr. Akillian,

12  defendant, testified at his deposition they did it so they

13  could -- they went through this Land Court process only so

14  they could convey their interest, their beneficial interest.

15  There was no other reason that they did it.   They didn't

16  readjust their distributions or their -- what they thought

17  they were going to get at that time.

18          They only did it so they could convey their interest

19  in the property.  They still intended to do -- do what the

20  trustees or their parents had wanted.  That was always the

21  intent.  They didn't reach an agreement when they all of a

22  sudden, "Oh, the property -- we own the property now.  The

23  trust is terminated.  We can do whatever we want."  That's not

24  what happened.  There's no affidavit that's what happened, and

25  that's not what Mr. Akillian testified at the hearing.  So

1  maybe --

2            THE COURT:   What hearing?

3            MS. BOUDREAU:   I mean at the deposition.   Maybe if

4  that *is* what had happened, I still don't think it would make a

5  difference from a 548 or a 547 perspective; but that's not

6  what happened.   There's no claim that that's what happened.

7            THE COURT:   All right, Mr. Cruickshank, did you

8  have anything else?

9            MR. CRUICKSHANK:   Your Honor, I think it's clear

10  that the testimony of David and Michael are necessary for the

11  Court to understand both the history of how the mortgage ended

12  up on the property and what the parties intended, and also,

13  based upon the discussion at today's summary judgment hearing

14  to also hear the closing attorney, upon whose advice it was

15  relied upon to go and get the deed and put it into the deed in

16  their own name, so that the Court can see what was intended.

17            So I don't think this is a matter of --

18            THE COURT:   Do you know why that was done?

19            MR. CRUICKSHANK:   My understanding, as a lawyer

20  that barely knows how to spell "real estate" and has never

21  done any -- not even insignificant real estate work -- it was

22  needed to clear a title, but --

23            THE COURT:   All right.

24            MR. CRUICKSHANK:   -- that's -- that's my guess.

25            THE COURT:   Well, the trust had terminated.

1          MR. CRUICKSHANK:    Clearly the trust had terminated.

2    That's correct, Your Honor.    So apparently this was the

3    mechanism by which the --

4          THE COURT:    So I'd like --

5          MR. CRUICKSHANK:    -- David and Michael could

6    transfer--

7          THE COURT:    -- both of you to do some further real

8    estate research if you don't mind, on the issue of whether

9    tenants in common can agree to be other than fifty-fifty

10   owners; whether any such agreement *must* be reflected in

11   writing for Statute of Frauds purposes; and what is the

12   interest of the debtor in property for the purposes of the

13   first clause of Section 548 with respect to the interest of

14   tenants in common under Massachusetts law?

15         MR. CRUICKSHANK:    And, Your Honor, just the first

16   one?

17         THE COURT:    I think that there's a presumption, but

18   I'm not sure whether it can be rebutted.

19         MR. CRUICKSHANK:    The first issue is can tenants in

20   common agree -- ?

21         THE COURT:    I should amend that.    I think there is

22   a presumption.    The question is, in this case is it

23   rebutted --

24         MS. BOUDREAU:    Is there a presumption --

25         THE COURT:    -- for the summary judgment motion?

1  What?  Yes, counsel?

2          MS. BOUDREAU:   There is a presumption that there *is*

3  an interest?

4          THE COURT:   That it's fifty-fifty.  And how is it

5  rebutted, and has it been rebutted in this case?  And can it

6  be rebutted by -- can it be rebutted orally?

7          I have a question for the Trustee's counsel, and if

8  you don't have the answer now, you or Mr. Braunstein can file

9  a status report.   What are the claims in the case?

10         MS. BOUDREAU:   I don't have an answer.

11         THE COURT:   Has there been a bar date?

12         MS. BOUDREAU:   I do not believe so, Your Honor.

13 Your Honor, I can -- just read you, as it relates to the Land

14 Court judgment issue, what David Akillian testified at his

15 deposition, and what Michael Akillian testified at his

16 deposition.  I asked:

17         "What precipitated the Land Court proceeding?

18         There was an action in the Land Court for a new

19         Certificate of Title so the property could be sold.

20         Do you know about that?

21         A.  I vaguely remember my cousin said that was

22         something that would have to be done.  We said

23         'Fine.'

24         Q.   Your cousin David Barber did that for you?

25         A.   Yes.

1       Q.    This is a copy of the Land Court judgment, and

2             that's the case I'm talking about.

3       A.    Okay.

4       Q.    Do you have anything else to tell me about that

5             case?

6       A.    I think we probably talked to David about the

7             fact that we wanted to sell the house, and he said

8             in order to do that you had to go through this

9             process, and we said, 'Fine.'

10      Q.    Okay.  So there was nothing adversary going on

11            between you and your brother as it related to this

12            Land Court action?

13      A.    No, not at all."

14      THE COURT:    That makes sense.

15      MS. BOUDREAU:    So there -- I -- there was no --

16      THE COURT:    Did anyone ask them what their

17 discussions were prior to the sale about proceeds?

18      MS. BOUDREAU:    Their discussions were that there

19 was this alleged agreement that happened between the debtor

20 and the mother during a phone conversation, back when the

21 defendant found out that the mortgages had been taken, and

22 that they were going to -- Michael was going to get paid back.

23 That was the -- that is the only discussion that has been

24 brought to light.   There's no written agreement, there was no

25 other oral agreement.   There was even in -- I think in the

1  Answers to Interrogatories -- well, I -- I -- there was no

2  agreement.

3          THE COURT:   So there was an oral agreement that --

4          MS. BOUDREAU:   An alleged --

5          THE COURT:   -- he would get a credit for the amount

6  of the mortgage that David had obtained through the mother.

7          MS. BOUDREAU:   That's what they're saying.

8          THE COURT:   All right --

9          MS. BOUDREAU:   But again, Your Honor, that --

10         THE COURT:   All right.   How long will it take you

11 to file the supplemental briefs?

12         MR. CRUICKSHANK:   As long as possible.   No.   A

13 couple weeks.

14         THE COURT:   That's fine.   You can have longer, if

15 you'd like.

16         MR. CRUICKSHANK:   Okay, that's -- that wouldn't

17 bother me.

18         THE COURT:   Three weeks?   Is that good?

19         MR. CRUICKSHANK:   That would be fine.

20         MS. BOUDREAU:   Gary, can we talk so we make sure we

21 have the same issues?

22         MR. CRUICKSHANK:   Yeah.   Yes.

23         THE COURT:   You can get a copy of the transcript.

24         MS. BOUDREAU:   Okay.   That's probably best.

25         THE COURT:   It wouldn't hurt to talk.

1                    MR. CRUICKSHANK:   Yes, Your Honor.

2                    MS. BOUDREAU:   Thank you, Your Honor.

3                    THE COURT:   Let me just give you a date for the

4    purposes of the order.

5                    MR. CRUICKSHANK:   Oh.

6                    THE COURT:   So the briefs will be due, say March

7    11th.   Thank you.

8                    MS. BOUDREAU:   Thank you.

9                    MR. CRUICKSHANK:   Thank you, Your Honor.

10                   THE COURT:   There's no -- and there is no bar date.

11   My clerk just checked.   There hasn't been a bar date yet.

12                   MR. CRUICKSHANK:   Okay.

13                   MS. BOUDREAU:   Okay.

14                   MR. CRUICKSHANK:   Thank you.

15                   MS. BOUDREAU:   Do you want -- should I have the --

16   shall I have the Trustee file a status report with respect to

17   claims?   Or can I --

18                   THE COURT:   No, I can look at the Schedules.

19                   MS. BOUDREAU:   Okay.   The Schedules are a part of

20   the -- the Appendix in the summary judgment.

21                   THE COURT:   I can get the Schedules.

22                   MS. BOUDREAU:   Yes.

23                   MR. CRUICKSHANK:   Thank you, Your Honor.

24                   MS. BOUDREAU:   Thank you, Your Honor.

25   (End at 12:12:56 p.m.)

```
1                    *  *  *  *  *  *  *  *  *  *  *  *

2          I certify that the foregoing is a true and accurate

3    transcript from the digitally sound recorded record of the

4    proceedings.
```

/s/  *Gloria C. Irwin*                                              12/16/2011

**GLORIA C. IRWIN**
**Certified Transcriber NJ AOC200**                                              **Date**
    **Federal  CERT #122**
**GCI TRANSCRIPTION SERVICES**
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**609-927-0299  1-800-471-0299**
    **FAX  609-927-9768**
**e-mail  irwingloria@comcast.net**
✔